**FILED**
**November 19, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0742—*In re Hon. Louise E. Goldston, Judge of the
13th Family Court District*

WOOTON, J., dissenting:

While I agree that Judge Goldston's conduct resulted in violations of the Code of Judicial Conduct and warrants discipline, I disagree with the censure issued by the majority. I would issue an admonishment in lieu of censure and therefore respectfully dissent. There can be little doubt that Judge Goldston improperly managed the entry into Mr. Gibson's home, particularly her threats of jail upon his objection, refusal to permit a record to be made, and attempted seizure of Mr. Gibson's cell phone. These actions alone plainly warrant sanction. In the first instance, however, it is beyond dispute that her underlying authority to conduct proceedings at his home in an effort to enforce her previously issued order presents a *legal* rather than an ethical issue, the parameters of which are subject to reasonable debate. Further, the convergence of these ethical and legal issues has been influenced by a litany of ancillary issues which have emerged since Judge Goldston and Judicial Disciplinary Counsel ("JDC") reached an agreement as to resolution, confounding the matter further. Therefore, while I agree that discipline is appropriate, in view of the foregoing I would concur in the recommendation of the Judicial Hearing Board (hereinafter "Hearing Board") and relegate the matter to an admonishment. [1]

---

[1] However, I have no objection to the majority's adoption of the $1,000 fine recommended by the Hearing Board.

1

This proceeding clearly presents a far more complex overarching concern than simple judicial misbehavior—perhaps more so than virtually any other judicial disciplinary matter which has been presented to this Court. This case presents a painstakingly fine distinction between whether the conduct herein is merely an ostensible legal error committed by a judge in the course of her duties, or judicial behavior so lacking in authority as to constitute an ethical violation. JDC argues strongly the Fourth Amendment search and seizure implications of Judge Goldston's conduct, the complete absence of express authority for the "home visit," and the lack of procedural due process afforded to Mr. Gibson constitute ethical violations. Judge Goldston—and to a large extent the amicus curiae The West Virginia Family Judicial Association ("WVFJA")—contend this was a mere error of law about the scope of her authority and, like any routine legal error, is undeserving of discipline. These are both objectively reasonable, equally defensible positions.

In fact, it is the responses to these debatable issues which belie any suggestion that this case is easily resolved. It is a rare—if not unheard of—judicial disciplinary case which yields twelve separate legal questions from the tribunal below after receiving an *agreed-upon* sanction from JDC and the respondent judicial officer. These legal issues were addressed with extensive briefing from the parties before the Hearing Board. Despite this extensive academic analysis and debate, the nine-member Hearing Board obtained no clarity on the issue, ultimately conceding that "although there was no clear legal foundation for conducting the judicial view in question, the scope of a judicial

officer's inherent authority relative to judicial views is uncertain[.]" Even before this Court the parties offer nearly 150 collective pages of briefing, with the JDC alone citing in excess of seventy-seven cases, fifteen statutes, and twenty-four rules to address the issues presented in this matter. Indeed, the majority issues two new points of law—including one about the authority of a judicial officer to participate in executive branch "search" functions—to support its resolution of the case. The depth of analysis and legal machinations needed to fully address this matter speak to the complexity of issues.

This complexity is markedly heightened by the "white noise" surrounding this matter's presentation to the Court. Although this Court sits as an independent, final arbiter of judicial discipline, disciplinary actions do not present themselves to the Court in a vacuum. Such matters arrive at this forum colored by the subjective impressions, individual judgments, and actions of those who have shaped them below. In this matter the Court is presented with a picture which is confounded by an agreed sanction between JDC and Judge Goldston (both of whom ostensibly later disavowed the agreement to some degree), sharply divergent views of the Hearing Board,[2] and acrimonious allegations of misconduct and bias in the disciplinary process itself—particularly with regard to the participation of the amicus in this case.[3] The impact of these unusual and startling conflicts

---

[2] A majority of the Hearing Board voted for admonishment and $1,000 fine. Two minority members voted for censure and a $1,000 fine; one member—Judge Glen Stotler— recommended dismissal of the charges.

[3] *See infra*.

commands caution in a case which already requires the Court to parse a fine distinction between legal error and ethical misconduct.

Indeed, the very disciplinary process in this matter finds itself under as much scrutiny as the underlying conduct itself. As alluded to above, following the hearing before the Hearing Board, JDC moved to disqualify Hearing Board member Judge Stotler from the proceedings on the basis of the questions which he posed at the hearing; he refused disqualification, denying any bias. Thereafter, Judge Stotler sent a letter to this Court demanding an investigation into the conduct of JDC with respect to this matter, and in a separate matter involving another family court judge.[4] Further, upon seeking amicus curiae status, the WVFJA took a position in ostensible support of Judge Stotler's criticisms of JDC, referencing in its briefing certain "threats" made by JDC if it sought amicus status in this matter, which JDC denied as characterized.

The process was further impacted by seemingly vacillating positions by JDC with respect to Judge Goldston throughout the pendency of this matter. In its representation to the Hearing Board, JDC stated that Judge Goldston was "completely cooperative," yet before this Court represented that Judge Goldston was only "somewhat cooperative." Also before this Court JDC suggested that Judge Goldston demonstrated a "distinct lack of any remorse" due exclusively to the content of her briefing on the legal issues raised by the

---

[4] Ultimately, however, the Judicial Investigation Commission found that JDC engaged in no unethical or improper behavior.

4

Hearing Board—issues to which Judge Goldston was *ordered* to respond.[5] JDC's objection alone would have required respondent to engage in briefing and argument before this Court about the propriety of her conduct. Her admissions below do not require her to forfeit her ability to respond to issues raised by JDC for fear of being found unremorseful. Further, despite entering into an agreement that it would accept the recommendation of the Hearing Board, JDC immediately filed an objection with this Court upon receipt of the Hearing Board's recommendation. JDC nevertheless characterized *Judge Goldston's* subsequent objection as a violation of their agreement to yield to the Hearing Board's recommendation.

I reiterate the foregoing to explain my reluctance to assent to the majority's full-throated condemnation of Judge Goldston's actions on the whole. I do not disagree that her entry into Mr. Gibson's home creates obvious Fourth Amendment issues which any judicial officer should have recognized, if not beforehand, at least when Mr. Gibson demanded a search warrant. Her response to Mr. Gibson's Fourth Amendment objection— to repeatedly threaten to jail him unless he relented in the warrantless entry and search— plainly warrants discipline. And while her *conduct* demands reproach, one cannot turn a

---

[5] In a similar reversal of position, JDC initially also asserted as error the Hearing Board's refusal to award costs in this matter. It argued that Judge Goldston agreed to be responsible for costs despite the written agreement (presumably prepared by JDC) which states, "[b]oth parties acknowledge and agree that neither the Judicial Investigation Commission nor [JDC] incurred any costs as a result of the investigation[.]"

blind eye to what was clearly Judge Goldston's good faith belief in her authority to undertake the "home visit" in the first instance.[6]

In this regard, I believe the majority has unfortunately squandered an opportunity to clarify the precise legal errors committed under the contempt statute and provide much-needed guidance as to the authority of a family court judge to conduct proceedings outside of his or her courtroom. To hold merely that judges cannot perform "searches" is too blunt a tool to be useful. West Virginia Code § 51-2A-9(b) (2012) provides:

> A family court judge may enforce compliance with his or her lawful orders with remedial or coercive sanctions designed to compensate a complainant for losses sustained and to coerce obedience for the benefit of the complainant. *Sanctions must give the contemnor an opportunity to purge himself or herself.* In selecting sanctions, the court must use the least possible power adequate to the end proposed. . . . Sanctions may include, but are not limited to, seizure or impoundment of property to secure compliance with a prior order[.]

(Emphasis added); *see also* W. Va. Code § 48-1-304(b) (2001) ("[I]f the court further finds the person has the ability to purge himself of contempt, the court shall afford the contemnor a reasonable time and method whereby he may purge himself of contempt."). In this case, however, Judge Goldston admitted that 1) she never held Mr. Gibson in contempt; 2) had

---

[6] In addition, while I do not condone the improper entry and search of Mr. Gibson's home, the resultant damage was merely the retrieval of items which he had already been ordered to produce and had willfully failed to do so. Regardless, the measure of harm to Mr. Gibson can be meted out in other proceedings and need not be considered herein.

not heard "his side" before going to his home; and 3) gave him no opportunity to purge himself of any such contempt, in violation of statute.[7]

Further, as to Judge Goldston's position that the "home visit" was a mere continuation of the proceedings, her failure—and refusal to allow Mr. Gibson—to record the proceedings was fatal to her effort. There is nothing which prohibits Judge Goldston from conducting proceedings outside of her courtroom; however, those proceedings must still comply with the applicable procedural rules. *See* W. Va. Code § 51-2A-8(c) (2017) ("Hearings before a family court shall be recorded electronically."); W. Va. R. Fam. Ct. Proc. 5 ("Proceedings in family court shall be recorded electronically on tapes or other electronic recording media."). As to Mr. Gibson's attempt to record the proceedings, Judge Goldston had authority to permit him to create a record—particularly in absence of an official record. Rule 8 of the Rules of Family Court Procedure expressly grants a family court authority to permit unofficial recordings: "*Unless prior permission is granted by the family court,* no person shall be permitted to make photographs, video recordings, sound recordings, or any other form of recording of proceedings[.]" (emphasis added). Certainly

---

[7] It appears Judge Goldston believed she had contempt power to compel Mr. Gibson's compliance with the entry pursuant to West Virginia Code § 51-2A-9(a)(3): "[A] family court judge may . . . [p]unish direct contempts that are committed in the presence of the court or that obstruct, disrupt or corrupt the proceedings of the court." However, as an experienced judicial officer, Judge Goldston should have recognized the distinction between obstruction of the proceedings and valid objections to the underlying process. By offering a ruling with adequate notice to the parties, reduced to appealable order, there is little chance the two scenarios would have been confused.

permitting an unofficial recording as a matter of practicality is vastly preferable to the absence of any reviewable record.

More fundamentally, Judge Goldston's procedure—by summarily undertaking the visit without notice to the parties upon proper, appealable order—deprived Mr. Gibson of the opportunity to lodge an objection or seek relief from Judge Goldston's intended entry into his home. It also deprived Judge Goldston herself of the opportunity to consider Mr. Gibson's objection, which was properly couched in terms of the constitutionality of her entry into his home and the ethical issue of making herself a witness.

Finally, my reluctance to join in the majority's censure of Judge Goldston's conduct stems not only from my discomfit about the nature of the underlying conduct and the circumstances surrounding the proceedings, but from a firmly held belief that this Court owes a measure of deference to the Hearing Board's recommendation. Unquestionably this Court has the authority to impose any discipline it deems appropriate, irrespective of the Hearing Board's recommendation. However, having the *authority* to "overrule" the Hearing Board does not speak to the wisdom of so doing. Like any fact-finding tribunal, the Hearing Board has the benefit of first-hand observation of the litigants and as such is "much closer to the pulse of the hearing to resolve such issues as credibility and conflict of facts." *Matter of Browning*, 192 W. Va. 231, 234 n.4, 452 S.E.2d 34, 37 n.4 (1994). Accordingly, this Court has noted that "[s]ubstantial consideration . . . should be given to the findings of fact of the Hearing Board." *Id.*

8

This deference to the Hearing Board should not, in my view, be limited only to its factual findings, but should extend equally to its discretion in assessing discipline, where no misapprehension of the law or facts exist. As we have explained: "To ignore the Hearing Board's findings would render its important adjudicatory role a useless gesture, deprive the parties of peer review, and deprive this Court of the most important benefit, the Hearing Board's collective and evaluative judgment." *In re Hamrick*, 204 W. Va. 357, 359, 512 S.E.2d 870, 872 (1998) (quoting *Browning*, 192 W.Va. at 234 n.4, 452 S.E.2d at 37 n.4). In this case, five of the eight participating members of the Hearing Board recommended admonishment, two recommended the more severe sanction of censure, and one recommended dismissal of the charges. The "collective and evaluative judgment" of the Hearing Board, while divided, determined that an admonishment best served the objectives of judicial discipline. There is nothing before us which would suggest that this recommendation requires enhancement.

Therefore, in view of the foregoing, while I do not take issue with the majority's analysis on the whole, I believe the circumstances surrounding this disciplinary proceeding, as well as the nature of the underlying conduct, militate firmly in favor of admonishment. Accordingly, I respectfully dissent.